**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF KENTUCKY**
**OWENSBORO DIVISION**

| | |
|---|---|
| ADAM WOOD, *on behalf of himself and all others similarly situated*,<br><br>Plaintiff,<br><br>v.<br><br>CRANE LENDING, LLC d/b/a CRANE FINANCE,<br><br>Defendant. | **Case No. 4:25-cv-122-DJH**<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

## CLASS ACTION COMPLAINT

Plaintiff Adam Wood ("Plaintiff") brings this class action lawsuit on behalf of himself and all others similarly situated, by and through undersigned counsel, and hereby alleges the following against Defendant Crane Lending, LLC d/b/a Crane Finance ("Crane" or "Defendant"). Facts pertaining to Plaintiff and his experiences and circumstances are alleged based upon personal knowledge, and all other facts alleged herein are based upon investigation of counsel and—where indicated—upon information and good faith belief.

## NATURE OF THE ACTION

1. On its website, Crane presents itself as an ally to borrowers, providing them with "the cash [they] need in order for [them] to get quickly back on [their] feet" after experiencing "unexpected expenses or emergencies."[1]

2. What their site doesn't say is that they take advantage of people at their most vulnerable, in desperate moments of financial hardship, and thumb their nose at the statutory laws

[1] https://www.cranefinance.com/

of the Commonwealth of Kentucky by employing a scheme to charge the customers they say they treat with empathy and respect illegal usurious interest rates of almost 800%.[2]

3. To do this, Defendant represents that Crane is a tribal lending entity that is wholly owned by the Menominee Indian Tribe of Wisconsin (the "Tribe"), a sovereign nation located within the United States of America.[3] In reality, Defendant operates a "rent-a-tribe" scheme in order to circumvent state usury laws, including the laws of the Commonwealth of Kentucky.

4. A rent-a-tribe scheme is a colloquial phrase used to describe the business practices of non-tribal payday lenders, including Crane, hiding behind the guise of a Native American tribe in order to avoid usury laws by invoking sovereign immunity.

5. Plaintiff Adam Wood brings this action to secure redress from predatory and unlawful loans issued and enforced by Defendant.

6. Plaintiff seeks a declaratory judgment that the loans are void under KRS 360.010 (Count I) and damages pursuant to KRS 360.020 (Count II) and KRS 367.110 (Count III).

## JURISDICTION AND VENUE

7. The Court has subject matter jurisdiction under 28 U.S.C. § 1332(a) as well as 1332(d) because this case is brought as a class action where the amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, there are more than 100 members in the proposed class, and at least one member of the class, is a citizen of a state different from Defendant.

8. This Court has personal jurisdiction over Defendant because Defendant has intentionally directed its business activities in Kentucky, targeting the Kentucky market, and purposefully availed itself of the privilege of conducting business in this state, including by

[2] *See* Exhibits 1-6.
[3] *See* https://www.cranefinance.com/

targeting Kentucky as a state in which to offer loans. In addition, the conduct underlying the claims that caused Plaintiff's injuries took place in Kentucky, that is, Defendant entering into and collecting payment on its usurious loans occurred in this state, which was foreseeable to Defendant.

9. Venue is proper in this District under 28 U.S.C. § 1391(a) through (d) because a substantial part of the events giving rise to this action occurred in this District, including entering into and collecting payment on the loans took place in this District.

**PARTIES**

10. Plaintiff Adam Wood is a natural person who at all times relevant to this matter resided in Owensboro, Daviess County, Kentucky.

11. Plaintiff Adam Wood moved to Minot, North Dakota in or around November 18, 2024.

12. Defendant Crane claims to be "a limited liability company wholly owned and controlled by, the Menominee Indian Tribe of Wisconsin." [4] On its website, Defendant Crane lists its address as P.O. Box 477 Keshena, Wisconsin, 54135.

13. Defendant Crane operates an online lending website, https://www.cranefinance.com (the "Website"), which makes loans at interest rates exceeding 780% to consumers in many states, including Kentucky.

**FACTS**

14. Between September 2, 2022 and September 28, 2024, Plaintiff obtained the following loans from Crane:

a. September 2, 2022: Loan # 630356 for $600 at 697.07% APR (Ex. 1)

---

[4] *Id.*

b. October 26, 2023: Loan #1310687 for $800 at 781.65% APR (Ex. 2)

c. November 4, 2023: Loan #1318945 for $950 at 645.21% APR (Ex. 3)

d. December 22, 2023: Loan #1445917 for $1,150 at 559.89% APR (Ex. 4)

e. February 5, 2024: Loan #1555662 for $700 at 775.02% APR (Ex. 5)

f. September 28, 2024: Loan #2254637 for $300 at 778.25% APR (Ex. 6)

15. Defendant's lending operations are financed through a revolving line of credit supplied by non-tribal entities including William C. "Cheney" Pruett and DMP Investments LLC, who provided the working capital used to fund consumer loans. The credit arrangement includes provisions giving Pruett and his associates effective control over Crane Finance's business activities, including approval authority over contractors and repayment priority on funds advanced.[5]

16. In or around late 2021, Pruett and DMP arranged for the Menominee Indian Tribe of Wisconsin to be presented as the lender of record for the newly created Crane Finance entity while retaining actual operational control. Pruett and his affiliates provided the capital, lending platform, and management functions necessary to run the enterprise, while using the Tribe's asserted sovereign immunity to avoid application of state lending laws.[6]

17. Pruett also operates a similar "rent-a-tribe" lending venture with the Lac du Flambeau Band of Lake Superior Chippewa Indians through an entity called Ningodwaaswi, LLC d/b/a Sky Trail Cash.

18. Public IP-address data show that Crane Finance's web servers are hosted off tribal land, despite claims of tribal ownership.[7]

---

[5] *See Gelly v. Accelitas, Inc., et. al.*, 6:24-cv-02375-JSS-DCI (M.D. Fla.Fcra 2024), ECF #1
[6] *Id.*
[7] *Id.*

19. On information and belief, the non-tribal principals, including Pruett and his related investors, receive the overwhelming majority of revenue from Crane Finance's lending activities, while the Tribe receives only a nominal percentage in exchange for its participation.

20. Accordingly, Crane Finance functions as a non-tribal payday-lending enterprise operated and financed by Pruett, DMP, and their affiliates, with the Tribe's limited involvement serving primarily to provide a sovereign-immunity shield against state regulatory and usury restrictions.

21. Defendant regularly makes loans to individuals in Kentucky at usurious rates of as low as 500% and more than 700% and use the same standard form loan agreement.

22. The loans were obtained for personal, family, or household purposes and not for business purposes.

23. At no time has Defendant had a license from the Kentucky Department of Financial Institutions or a state or federal banking or credit union charter, entitling it to make loans to Kentucky residents at more than the statutory maximum of 8%.

24. Defendant nevertheless advertises and makes loans to Kentucky residents at rates greatly exceeding 8%.

25. Plaintiff signed the loan agreements electronically, while in Kentucky.

26. The funds were transferred electronically to Plaintiff's bank accounts in Kentucky.

27. Repayment was to be made by ACH debit from Plaintiff's bank account in Kentucky.

28. Plaintiff was a resident of Kentucky at all relevant times.

29. At no time did Plaintiff visit the State of Wisconsin or any business premises of any Defendant in connection with the loans.

30. Crane's Website states that it does not allow access or accept applications from residents of all locations.[8]

31. Defendant intentionally violated Kentucky's rate limitations because it concluded Kentucky authorities were unlikely to take action to enforce their usury laws against them.

## KENTUCKY'S PROHIBITIONS ON PREDATORY LOANS
## Kentucky Revised Statutes Chapter 360

32. Effective July 14, 2018, KRS 360.010 governs the legal interest rate that may not be exceeded with respect to residents of the state. KRS 360.010 forbids, with limited exceptions that do not apply here, parties from agreeing to a per annum interest rate higher than 8%.

33. Under KRS 360.020, the knowing "taking, receiving, reserving, or charging of an interest rate greater than is allowed by KRS 360.010 … shall be deemed a forfeiture of the entire interest which the note, bill, or other evidence of debt carries with it." Where greater interest has been paid, the statute provides for "twice the amount of interest thus paid from the creditors taking or receiving the same: provided, that such action commenced within two (2) years from the time that the usurious transaction occurred." KRS 360.020(1).

34. Any loans to Kentucky residents at more than 8% that are made by lenders violate KRS 360.010 and are subject to damages under KRS 360.020.

[8] *See* https://www.cranefinance.com/

## INVALIDITY OF CLAIM OF TRIBAL IMMUNITY

35. In an attempt to evade prosecution under usury laws of states like Kentucky, online lenders frequently create an elaborate charade claiming their otherwise illegal businesses are entitled to the sovereign immunity of Native American tribes.

36. However, an entity must function as a legitimate "arm of the tribe" in order to fall under that tribe's sovereign immunity. *See Breakthrough Mgmt. Grp., Inc. v. Chukchansi Gold Casino & Resort*, 629 F.3d 1173, 1183 (10th Cir. 2010).

37. To determine if a particular entity is entitled to sovereign immunity, the majority of courts have adopted the framework laid out in *Breakthrough*, which analyzed "(1) [the entities'] method of creation; (2) their purpose; (3) their structure, ownership, and management, including the amount of control the tribe has over the entities; (4) whether the tribe intended for the entities to have tribal sovereign immunity; (5) the financial relationship between the tribe and the entities; and (6) whether the purposes of tribal sovereign immunity are served by granting immunity to the entities." *Breakthrough*, 629 F.3d at 1183, 1187-88.

38. These so-called "tribal lenders" do not survive scrutiny when examined closely, since virtually all business functions occur far from tribal land, are conducted by nontribal members, and overwhelmingly benefit non-tribal members to such a degree that tribal involvement is effectively nil.

39. Where non-tribal individuals and entities control and manage the substantive lending functions, provide the lending capital necessary to support the operation, and bear the economic risk associated with the operation, they are not in fact "operated" by Native American tribes, and, therefore, are not shielded by sovereign immunity.

40. Further, sovereign immunity, even if legitimately invoked, still does not turn an otherwise illegal loan into a legal one. *See, e.g., United States v. Neff*, 787 F.App'x 81 (3d Cir. 2019) (upholding criminal convictions of two individuals engaged in an online payday lending rent-a-tribe scheme, stating that sovereign immunity/ does not transform illegal loans into legal ones and that "reasonable people would know that collecting unlawful debt is unlawful").

41. Attempting to circumvent state interest caps by fraudulently hiding behind tribal sovereign immunity has been found to constitute criminal conduct. *See United States v. Tucker, et al.*, No. 1:16-cr-00091-PKC, 2024 U.S. Dist. LEXIS 155383 (S.D.N.Y Aug. 28, 2024); *aff'd by United States v. Grote*, 961 F.3d 105 (2d Cir. 2020).

42. A review of online resources shows that non-tribal people and entities are the primary beneficiaries of Defendant's lending operation. Namely, key employees of Wolf River Development ("WRD"), supposedly the Tribe's wholly owned development arm[9], are not located near the Tribe and appear to have no Tribal affiliation. For example, Dale Inman is listed as the managing partner of WRD. He lives in Detroit, Michigan.[10]

43. Off-reservation business operations, comprising substantially all of the company's functions, are conducted primarily by William C. Pruett, who operates the lending business from Texas, providing all loan capital through restrictive credit agreements, controlling underwriting decisions, managing the website from servers on non-tribal lands, conducting customer service and collections through non-tribal contractors, and receiving approximately the vast majority of revenues.

44. The fact that a single tribe is associated with multiple "tribal lenders" indicates that the tribe is not the real party in interest behind any of them but has allowed its name to be used by

---

[9] *See* https://www.wolfriverdevelopment.com/purpose/
[10] https://www.linkedin.com/in/dale-inman-88a07a10/

multiple third parties to operate high-interest lending businesses. Otherwise, there would not be any need to lend under five or more different names.

45. Crane is one of multiple high-interest lending entities supposedly owned by the Menominee Indian Tribe. Others include: (1) East Line Lending, LLC[11]; (2) Elk Lending, LLC[12]; (3) Fox Lending, LLC d/b/a Loop Fund[13]; (4) West Side Lending, LLC[14]; (5) Northern Star Lending[15]; and (6) Eagle Lending, LLC d/b/a Fineday Funds,[16] to name a few.

46. The Washington State Department of Financial Institutions has issued a consumer alert notifying the public that it has received complaints from consumers about the Menominee Indian Tribe's online tribal lending entities, including Crane.[17]

47. Despite representations of Tribal management of the lending operations, the Tribe receives only a small fraction of Crane Finance's revenues for the use of its name. No meaningful lending operations occur on tribal lands, no tribal members are employed in operational roles, and all strategic business decisions are made by non-tribal management without tribal input or control.

48. While the Tribe's names and the names of some officers appear in documents establishing the formation of the corporate charters under which Crane operates, on information and belief, such documents were designed, written by, approved by, and crafted for the benefit of non-tribal beneficiaries.

49. According to Tribal leaders, the Tribe has experienced significant poverty with over 37% of Menominee County Children living in poverty.[18]

---

[11] *See* http://www.eastlinelending.com/
[12] *See* https://elklending.com/
[13] *See* https://loopfund.com/
[14] *See* http://www.westsidelend.com/
[15] *See* https://northernstarlending.com/
[16] *See* https://finedayfunds.com/
[17] *See* Exhibit 7.
[18] *See Menominee County ranked least healthy in Wisconsin; tribal leaders attribute to poverty* (April 28, 2022), https://www.nbc26.com/news/local-news/menominee-county-ranked-least-healthy-in-wisconsin-tribal-leaders-

50. The Tribe has no significant assets to leverage as collateral for the multi-million dollar revolving lines of credit required to fund multiple online payday lending enterprises which lend upward of $100 million a year.

51. On information and belief, while the Tribe is the nominal owner of Crane, covenants in the lines of credit used as working capital to fund loans require the Tribe to hire only investor-approved managers, underwriters, marketers, software vendors, and other service providers.

52. The loan covenants also require the Tribe to waive sovereign immunity with respect to the non-tribal investors, leaving the Tribe vulnerable to legal actions.

53. Thus, the Tribe exerts no control over the business, how it is operated, who it lends to, and so forth. Any tribal involvement does not go beyond the hiring of a handful of tribal members to work as phone customer service representatives or similar low-level jobs.

## CLASS ALLEGATIONS

54. Plaintiff brings this claim on behalf of a class, pursuant to Fed. R. Civ. P. 23(a) and (b)(2), on behalf of himself and the following class of similarly-situated persons:

> All persons residing in Kentucky who, within the relevant statutory period, entered into a loan agreement with Defendant and paid money pursuant to the agreement.

55. Plaintiff may alter the class definition to conform to developments in the case and discovery.

---

attribute-to-poverty, ("The University of Wisconsin's Population Health Institute released its annual rankings of the health of every county across the state. And out of 72, Menominee County is ranked the least healthy. "My reaction to that, at least my immediate reaction, is poverty," Tribal Chairman Ronald Corn Sr. said. According to the data, 37 percent of Menominee County's children live in poverty. The county has just over 4,500 people.")

56. The class is so numerous that joinder of all members is not practicable. On information and belief, based on the making of loans over the Internet using form documents, there are at least 100 class members.

57. There are many questions of law and fact common to the claims of Plaintiff and the proposed members of the Class, and those questions predominate over any questions that may only affect individual members. Common questions for the Class include but are not limited to the following:

a. Whether the loans at issue are usurious under Kentucky law;

b. Whether the loans at issue are void as contrary to public policy;

c. Whether Defendant made deceptive, misleading, or false representations in connection with the loans;

d. Whether Plaintiff and the Class may recover money paid to Defendant pursuant to any of the loans;

e. Whether Defendant's conduct was willfully or knowingly unlawful.

58. Plaintiff has and will continue to fairly and adequately represent and protect the interests of the Class and has retained counsel competent and experienced in complex litigation and class actions. Plaintiff has no interests antagonistic to those of the Class, and Defendant has no defenses unique to Plaintiff. Plaintiff and his counsel are committed to vigorously prosecuting this action on behalf of the members of the Class, and they have the resources necessary to do so. Neither Plaintiff nor his counsel have any interest adverse to those of the other members of the Class.

59. Plaintiff's claims are typical of the claims of the members of the Class. Plaintiff sustained damages as a result of Defendant's uniform wrongful conduct during transactions with Plaintiff and the Class.

## COUNT I
## VIOLATION of KRS 360.010
## Declaratory Judgment
***(On behalf of Plaintiff and Kentucky Class Members)***

60. Plaintiff repeats and re-alleges each allegation contained in the Complaint as if fully set forth herein.

61. An actual and existing controversy of a justiciable nature exists between the parties with respect to the issues set out herein within the scope and meaning of 28 U.S.C. § 2201.

62. Defendant contracted for and collected loans at more than 8% interest from Plaintiff and the class members, in violation of KRS 360.010.

63. In accordance with 28 U.S.C. §§ 2201 and 2202, Plaintiff is entitled to a declaration that these agreements are void and unenforceable against the Plaintiff and the class members.

## COUNT II
## VIOLATION of KRS 360.020
***(On behalf of Plaintiff and Kentucky Class Members)***

64. Plaintiff repeats and re-alleges each allegation contained in the Complaint as if fully set forth herein.

65. Defendant has devised and engaged in a scheme to fund, issue, and collect usurious loans through a rent-a-tribe scheme.

66. Plaintiff has taken usurious loans from Defendant and was forced to personally guarantee these debts.

67. Defendant is not exempt from state usury laws, nor are the transactions that are the subject of this action exempt from state usury laws.

68. The interest charged by Defendant in connection with these transactions was in excess of the maximum interest rate permitted by KRS 360.010.

69. Plaintiff has in fact paid Defendant interest in excess of the maximum interest rate permitted by KRS 360.010.

70. Defendant knowingly and willfully entered into the loans with usurious intent.

71. As a result of the foregoing illegal acts and practices, the Defendant has surrendered their right to collect any interest on any of these amounts.

**COUNT III**
**VIOLATION OF THE KENTUCKY CONSUMER PROTECTION ACT**
**KRS 367.110, et seq.**
**(*On Behalf of Plaintiff & Kentucky Class Members*)**

72. Plaintiff and the Class repeat and re-allege all other paragraphs of the Complaint as if fully set forth herein.

73. Defendant is a "person" for purposes of the Kentucky Consumer Protection Act ("KCPA"), KRS 367.110, et seq.

74. Defendant's conduct as alleged herein occurred in the conduct of trade.

75. The KCPA prohibits "unfair, false, misleading, or deceptive acts or practices in the conduct of any trade." Any person who "purchases or leases goods or services primarily for personal, financial, or household purposes and thereby suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment by another person of a method, act or practice declared unlawful by Ky. Rev. Stat. § 367.170, may bring an action under the Rules of Civil Procedure . . . ." KRS 367.220.

76. Defendant violated the KCPA by intentionally violating Kentucky's rate limitations and attempting to circumvent state usury laws by fraudulently and deceptively hiding behind tribal

sovereign immunity. Defendant had an ongoing duty to Plaintiff and the Class to refrain from unfair and deceptive practices under the KCPA in the course of its business.

77. Plaintiff and the Class suffered ascertainable loss and actual damages as a direct and proximate result of Defendant's unfair, fraudulent, and deceptive behavior.

78. Defendant's unfair, fraudulent, and deceptive conduct was either knowing, willful, and intentional, or, alternatively, demonstrated a lack of care, recklessness, or conscious disregard for the rights of Plaintiff and the Class, and thus Plaintiff and the Class are entitled to punitive damages.

79. Defendant is liable to Plaintiff and the class members for damages in amounts to be proven at trial, including attorney's fees, costs, and punitive damages, as well as injunctive relief enjoining Defendant's unfair and deceptive practices, and any other relief deemed just and proper.

Respectfully submitted,

**/s/ Amanda M. Lockaby**
Matthew T. Lockaby
Amanda M. Lockaby
Abigail C. Wearden
Lockaby PLLC
476 East High Street, Suite 200
Lexington, Kentucky 40507
Tele: 859.263.7884
Fax: 859.406.3333
Email: mlockaby@lockabylaw.com
alockaby@lockabylaw.com
awearden@lockabylaw.com

**/s/ Matthew J. Langley**
Matthew J. Langley
(*pro hac vice forthcoming*)
Almeida Law Group LLC
849 W. Webster Avenue
Chicago, IL 60614
Tele: 773.554.9354
Email: matt@almeidalawgroup.com
*Counsel for Plaintiff and the Class*